Good morning and may it please the court, your honors. My name is Samantha Harris. I'm the attorney for the appellant, Stephen Porter. This case concerns the district court's dismissal of a professor's First Amendment retaliation claim. The court held both that the actions of N. C. State were not materially adverse and that Dr. Porter's speech was not protected. Both of these findings were in error and at the very least were premature at the 12B6 stage before any factual record had been developed. Oh my gosh, I'm so sorry I forgot. No, no, I would like to take it off. Did you hear what I said, okay? Okay, so the first error was the finding that the action was not materially adverse. The Supreme Court in Burlington Railway v. Wright set the standard for in a retaliation case and in this circuit has held that the Title VII and First Amendment retaliation standards are analogous, that the question is whether an action would deter a reasonable person from coming forward with either a claim of discrimination or a claim of retaliation and that to determine whether the action was materially adverse, the court needs to look at the constellation of surrounding relationships, circumstances, and expectations. And the court emphasized that this can vary depending on the individual. So they used the example of a schedule change, which for an employee with a flexible schedule might not make a significant difference, but for a young parent with school-aged children might make a huge difference. And so, you know, what the court needed to do in this case was look at the circumstances, expectations, and relationships in the university setting. And in the university setting, faculty are reviewed, tenured faculty included, not just on teaching and research, but also on their service to the university and this includes things like sitting on committees and mentoring students. Correct. Yes. Yes. So the problem that you're bringing to us is a question of whether he's been in a position where he might be terminated or something could happen or... Well, yes. So the number of, one of his significant roles, he doesn't work with undergraduate students, so he teaches and he advises PhD students. And the number of advisees that he has has dropped dramatically because he has been siloed in this sort of dying and under-resourced area of his department where he's unable to attract PhD students. How do we know that's the case? Maybe the number of people who want to be advised by him has dropped dramatically because of his commentary. Well, Your Honor, I mean that's... They don't want to be advised by him. That's purely speculative. I mean, the applications to the area, he is siloed in... Isn't it just as speculative that it was in retaliation for his internal communications? Well, first of all, I would challenge the idea that they were purely internal communications. But, Your Honor, it's not speculative that that's why... Some of them were purely internal communications, correct? Well, they were made internally, but they were concerning issues of public concern. So they were not purely just sort of the kind of employment concerns that this court and others have held to be sort of purely workplace communications and not issues of public concern. So, you know, NC State made clear that it was removing him from his program area because of his communications and his speech, which they perceived as unprofessional. But, you know, what we have fled in the complaint is that they perceive them as unprofessional because they disagreed with them. And the fact that someone subjectively perceives speech as unprofessional or disrespectful doesn't alone deprive it of... Help us understand just Thacker's question. Your allegations are, as far as an adverse action, is that they took steps to limit his access to Ph.D. students. Yes. Right? And we know, as a factual matter, that he has fewer Ph.D. students. But that's just the conclusion. Your point is that the limitations on what they did is the actual adverse action. The number of Ph.D. students he has might be for a number of reasons. But the actions they took to limit his access to them, that's what's adverse. Yes. And, I mean, those actions were very clear. I mean, they excluded him from meetings where advisees were assigned. They actually excluded him from participating in an important review process for some of his current advisees. And that was something at the time that he reached out and said, how am I supposed to have, you know, a relationship with these advisees if I'm not taking part in this critical aspect of their Ph.D. process? So, yes, they took... Yes. The point is that's a limitation that would, in your view at least, deter an ordinary person from doing this. Yes, exactly, Your Honor. And the reason that I was talking about the fact that the advisees were down is because the district court referred to the harm as purely speculative. And, obviously, since time has passed since the filing of the complaint, we're able to see that this has played out exactly as Dr. Porter feared when he went to his department head and said, it feels like, you know, you're taking these actions to set it up so that, you know, a few years down the road, when I don't have any advisees, you can say I'm not doing my job and fire me. But that sounds speculative, right? So, like, a few years down the road, you might fire me. But it seems to me that what I thought your adverse action argument was was related to the Ph.D. students today, and that if you're a faculty member, like, advising students or teaching, I mean, that's sort of part of what your core job responsibilities are. Yes. Yes, exactly, Your Honor. And that goes back to the question that Judge Wann asked in the first place was what was the adverse action? Because he's still there. He's still tenured, still teaching. And your response is that he has fewer advisees. Anything else? Well, I mean, our response is, first of all – To be clear with the question, we're dealing with an adverse informant action. It would have been somewhat predestined in how we deal with those things. He hasn't lost – he hasn't been demoted since he's been tenured. He's tenured. He hasn't lost any pay or opportunity for promotion or advancement that's there. But – so those are the kind of harms that typically when we're looking at adverse informant actions. So you're saying we should extend this to deal with situations in which the kind of adverse action Judge Richardson alluded to. He can't teach certain students. He can't teach – he's not having access to Ph.D. students. And, therefore, that's adverse. But we have to speculate what is the adverse. I mean, I guess you have to know educational law in universities, but you have to speculate what that is. And at least it seems. So address that from that perspective. Well, Your Honor – It seems like an atypical thing for us in adverse informant acts. It's something we should consider as an adverse one. So, thank you, Your Honor. I mean, since Burlington Railway v. White, there are two different standards for sort of substantive discrimination where you're talking about demotion and loss of opportunity, and then this sort of materially adverse action that would dissuade a reasonable person from coming forward. And so, particularly in the university context – and, again, the Supreme Court has said you have to look at the particular context – particularly in the university context, these types of actions are materially adverse. You know, Dr. Porter only deals with Ph.D. students, teaching and advising them. So being significantly restricted in his ability to advise them deliberately is an adverse action. And, you know, after White, courts around the country, including courts in this district, have held in the university context that these types of actions are materially adverse. So, you know, in this circuit, in the case called Cravey v. UNC, you know, the district court held that reduced opportunities for promotion and professional development were a materially adverse action. There was a case from the Northern District of New York, actually, Aslan v. University of Rochester, which I think, although it's outside of this jurisdiction, the language is particularly relevant here. This professor alleged they had been excluded from important meetings, and the court held that the fear of employer-sponsored isolation, which is precisely what the university has done to Dr. Porter here, would be sufficient to deter a reasonable person in those circumstances from coming forward. And, you know, this is university's modus operandi. We call it sort of the death by a thousand cuts, just kind of gradually hollowing someone's career out from the inside. And when you think about higher education, in which many of them are moving in directions in which they're more specific to religious institutions, you have other institutions in which it may seem like a death by a thousand cuts, but aren't they entitled to kind of have professors that sort of fit more within their mission and the way in which they operate, and to what extent do the courts then look in and say, well, you can't do this to this person here or that. When they say, no, we're keeping you here. You just can't go here in this area. You can't do that. I mean, I'm trying to understand how much do we manage the education process. It's hard to believe that as a judge I should be telling the president of the university or the dean of the university or even the university, the university going on forever, who and how they should put someone in a position when the major adverse action, he's still there, he's tenured, he's being paid, he's not been demoted, but now I'm getting into, well, he's spoken out on stuff and you can't move him from this department and you've got to put him here. How, break that down for me a little bit. And maybe break it down in the context of causation in terms of his speech and how that caused this to happen. Well, you know, first of all, Your Honor, I think in the context of private universities, you know, you're correct, they have the right to have a mission and to hire people and retain people based on whether they align with this mission. But professors at public universities are public employees, so they can't be subjected to adverse actions in retaliation for their speech on matters of public concern. And here, you know, NC State. Private universities have some goal to want to try to have a level of education of a certain, public ones I should say. I don't think it's just private ones in terms of, well, they can do certain things, public can't, they can't I guess to an extent. But when we're dealing with the major type of adverse actions here, and then we get into the operations. And I know, of course, increasingly the courts are going there. I know we're going there. And that's the way I want to go, but I'm just saying, how do I get into telling NC State, you were wrong, you should put him over in this department here, you should do this. Even though they say, no, he stays here, he gets the same pay, he's tenured, nothing has happened to him. And he says, no, you can't do me like that, because that's going to hurt me in the future, or it's going to hurt me down the road. Well, but it did hurt him in the present, too. I mean, like I said, he was prevented from participating in critical activities for Ph.D. advisees when he was removed from that program area. They excluded him from there. He wants to participate in those activities because of a future benefit. Well, because mentoring Ph.D. students is a significant part of his job. So, you know, in trying to cut him off, I mean, you know, our argument is that trying to cut someone off from a significant part of their job responsibilities isn't something that they are, in fact, you know, required to do. What you're asking the court is now tell NC State, you've got to let him go and mentor your students here. And you've got to make them do these operational things here. You can hire him, keep him the same pay, but now we're going to tell you how you can use him. But isn't the question here, did his speech cause any of this? And how, what is the evidence this speech caused that to happen? Okay, well, quickly, sort of to answer your first question, I mean, it is under Burlington v. White that the court is obligated to look, you know, at the specific facts and circumstances of the case, which is, again, why I would say. I'm not, I'm not, I'm not. This is sort of a 12 v. 6 versus summary judgment issue there. And what I'm trying to say is there is a reality. We're dealing with a university here. And we are judges up here. And when you bring these matters up here, what's the next thing you're going to tell us? I mean, is the coach on the football team? He's not a good offensive coach over here. And yet, you know, he said some speeches and he now moved into a different position. We're going to tell that because that follows the same thing in my book. Is there any evidence here that this guy, that Mr. Porter, Professor Porter was not a good offensive coach, that he was a bad teacher, that he was not performing in the classroom? None at all, and in terms of the causation. I want to make sure we return. I don't want to get off the field on football and that sort of thing. I want to deal with the reality of what we're dealing with here, and that is the extent the courts, and we are to begin to get involved in operational aspects of a university. The issue here really is whether his speech caused any of this. In other words, what is the approximate cause between the speech and this so-called adverse action? And what are the allegations that you make that it was a substantial factor there? Well, he was removed from the program area explicitly for speech that, you know, the administration subjectively deemed, you know, unprofessional and disrespectful. Now, NC State would argue that the mere fact that there was this subjective decision that his expressions of opinion were disrespectful renders it unprotected, but that's not what the First Amendment case law says. You know, the fact that the First Amendment in its official capacity, or are we talking about as a citizen? Well, he was speaking as a citizen on matters of public concern. The fact that some of the communications were made in the workplace. Internal e-mails he was speaking as a citizen on a matter of public concern? Internal e-mails to the faculty about, I know your time is up, but is that when he was speaking as a citizen on a matter of public concern? Well, the most proximate expression that led to his removal from the higher education program area was his blog post about a conference that was not even an NC State conference being a, quote, That's the only one. The blog post is the one that's not as internal. In terms of where the communication was made, that's correct. But, you know, courts look. I don't have any. I just want to make sure that I'm clear. You do believe that just because it was sent internally does not preclude it from being a statement by a citizen on a matter of public concern. I mean, the courts have said that broadly. Like, the mere location of where the speech was made is not determinative of whether it is a citizen making a statement on a matter of public concern. Yes, Your Honor, that's correct. Thank you very much, Mr. Harris. We'll hear from Mr. Dayton representing the affiliate. Good morning, and may it please the Court. Eric David on behalf of the Board of Trustees of North Carolina State University and individual defendants. I'm here with my colleague, Greg Gott. My co-counsel, Kari Johnson, from the North Carolina Department of Justice, intended to be here at a COVID exposure this week. Glad you didn't bring it. Indeed. I'm glad our moot was last week. Your Honors, it is a quintessential characteristic of modern American society to presume that every annoyance or inconvenience we endure at work violates the Constitution. In your time dealing with the questions that have been presented by the court here, particularly insofar as the adverse employment action that's alleged to you. Yes, sir. Can you start with the suggestion that was made that in this case of First Amendment after Burlington, that it requires a major adverse employment action like getting fired or tenure being removed? You agree that that's not the right standard, right? Well, I think the standard is would a reasonable professor, tenured professor of ordinary firmness be dissuaded from the speech. But it's not after Burlington an adverse employment action. That's for discrimination claims, not retaliation claims. Well, there has to be material adversity. I mean, that's what they said in Burlington. It has to be materially adverse. It has to be more than a minor annoyance. But the difference being it's not an adverse employment action. That's limited to discrimination claims. It's an adverse action that would dissuade an ordinary person from speaking. Yes, sir. It doesn't have to be a firing or a demotion or a loss of pay. That is correct. I think there's an important point to make. My friend on the other side said that the number of advisees dropped dramatically, I think was what she said in her argument. That is not in the complaint anywhere. There's no allegation in the complaint that he has a lower number of advisees today than he had in 2019. He never even had any. Yes, Your Honor, that's exactly right. Can I ask you a purely hypothetical, and I acknowledge on the front end it's a hypothetical, right? So don't tell me this is different, right? I get that. It's a hypothetical. If he, if NC State at this point in time, and I'm only focused on whether it's an adverse action, not the rest of the aspects of this, if Professor Porter was told, you may not supervise Ph.D. students, right? He's prohibited from advising Ph.D. students. Do you agree that that would have been an adverse action? I think in theory it could have been if all he did was work with Ph.D. students and the university said. Not all. I mean, I'm going to hold the other facts. I mean, he also taught some classes, but it was a substantial part of his job, but it wasn't the only thing he did, right? He also taught four classes. So otherwise we hold it constant. But if he was told, you may not, you're precluded from advising Ph.D. students. And I understand that's not where we are. Your Honor, to I think answer that question, there has to be, if there's a nexus between the advising and the job. I'm assuming causation and all these other things apart, right? I'm just trying to figure out, would that be an adverse action? It could be, yes, Your Honor. I would agree with that. But that's not the, I know you told me not to say this. No, it's fine. You can say it now. As long as you answer the question first. Yes, sir. Say it now. It really isn't the allegation. There are three, I think, buckets of what he would call adverse actions. The first was the removal from the higher education program area. Now, it's undisputed that he was not advising, did not work with Master's students, and the university reorganized in 2015 to have these two tracks. The program areas was for Master's students, program area of study. How long after that did they remove him? Only after he made the blog post, right? It was 2019. After he made the blog post. They didn't do it for four years, and then he makes the blog post, and they're like, oh, yeah, like the pipeline program that gets you your Ph.D. students. You can't be a part of that now. Well, Your Honor, I think— Master's students? I'm sorry. Master's students versus Ph.D. students? Yeah, the program area he was removed from was just Master's students. The action, the removal or the reassignment from the higher program area also was, and in fact between the blog post and the removal or the reassignment, was when he had this faculty meeting where he used the F word sort of unprovoked in a faculty meeting. And so the notion that the causation, Judge Winn, to go to your question about causation, the notion— Where's that in the complaint? Your Honor, that is—I will find it for you, Your Honor. It's at a 12B6, right, and so we're just looking at the complaint. Yes, and he alleges in the complaint that there was a faculty member that they were recruiting and they were going to have a meeting. The spousal one. The spousal hire, yes, sir. And when they had the meeting, Dr. Pask suggested, listen, let's set up a new program area of study. It will have this new faculty member. It will have you, Dr. Porter, and it will have me, Dr. Pask. So, again, the notion that she's retaliating against him when she suggests joining a program area of study with him, I think, is sort of contradicted by the complaint. And then in the course of that meeting, he uses the F word in a, frankly, unprovoked sense. There was no—and so shortly after that is when Dr. Pask wrote a letter and said, this is similar to the bullying we saw in 2016, and this is similar to the internal email where you attacked another colleague. And so connecting all that, she said, we've got to work on getting along. We've got to work on collegiality and internal effectiveness and efficient operation. So the timing causation, there was actually this event in the middle that I think is just as much a cause for any reassignment that happened after that. Okay. You talked about the one bucket of adverse— Yes, Your Honor. —actions. What are the other two? So the second bucket is this handful of meetings and a picnic that he was, he says, excluded from in 2019. And that sort of connects to this issue about the assignment of advisees. And what he says in the complaint is that's where we had an opportunity to recruit advisees. But there's never an allegation— How did he stop somebody from going to a picnic? I'm sorry, Your Honor. How did he stop somebody from going to a picnic? Well, that's the allegation— What would have happened had he shown up? That's the allegation in the complaint. So we'll take it as true, Your Honor, that it was, in fact, a quote-unquote exclusion. What stops you from coming in the conference room with us? Right? The door's open. But you're not going to do it because you've been told not to. Yes, Your Honor. I agree. And, again, we'll take the complaint's allegations as true on whether it was an actual exclusion or not. The problem is that the complaint is filed two years later, and there is not a single fact in the complaint of an actual adverse consequence for missing those meetings. He doesn't allege he's lost advisees. He doesn't allege that he's not—fewer kids are in his classes. He doesn't allege any sort of consequence from missing this handful of meetings in 2019. And then the third bucket is this program area of study. There was a new program area of study established in 2019. Dr. Porter alleges that he wasn't invited to be in that program area of study. He says he was the only person not invited. But as we noted in our brief— Does he allege that he asked to be included? He does not, Your Honor. As we pointed out in our brief— He never asked or indicated that he would like to be included in that program area of study based on the allegations in the complaint? That's right. He just, again, wasn't invited, like the picnic. Exactly. And, in fact, it turns out that he wasn't even the only person not in that program area of study according to the allegations of the complaint. And this is why the district court, I think, quite correctly looked at all of this and said, these are all minor inconveniences, minor annoyances that, even under Burlington, are not materially adverse, and therefore— Oh, here it is. I'm sorry. Here it is, paragraph 60JA19. He himself alleges that he said, give me an effing break, folks, in the staff meeting. Yes, Your Honor, that's right, and thank you for pointing that to me. It is a fact in his complaint that he alleges, and, again, the timeline there is important because the blog post was September of 2018. The meeting— That timing is laid out in his complaint. That's right. That's exactly right, Your Honor. All you have to do is read his allegations. That's right. Taking it on its face, this meeting, which was completely unrelated to the blog post, said nothing about the blog post, was October 15th of 2018, so just four or five weeks later. And then right after that is when Dr. Pask wrote him a letter laying out her concerns about his collegiality and, frankly, his ability to get along with his colleagues. But that wasn't the only time he'd been warned about his lack of collegiality. That was just the last straw. Quite true, Your Honor, and the first time was connected to this meeting, an internal faculty meeting in the spring of 2016, where there was a discussion about a survey question, a course evaluation question. And as alleged in the complaint, what Dr. Porter questioned the junior faculty member about was the survey methodology. And that comment—it's a little vague what he said in the complaint, but even taking all that as true, there's not a word about social justice, there's not a word about diversity, there's not a word about wokeness. What he says is, I was questioning her about survey methodology, which is just doing my job, is what he said in the complaint. So— What about the temporal proximity aspects that the trial judge pointed to? Yes, sir. So on causation, I think the district court was, I think, clearly correct and, frankly, was bound by a penalty this court's holding that said an eight- or nine-month gap is insufficient to establish temporal proximity. And this is a ten-month gap between the blog post in July of 2019 when he was reassigned from the higher education program area. And even— Is it—we talked to your colleague about causation as being, you know, a proximate cause or substantial factor. I thought that causation in this context was a but-for cause, but can you help clarify that for me? Is it proximate cause or but-for cause? Well, it is definitely but-for, and then sometimes that's been characterized as a substantial factor. But the test from the Huang case and Ridpath and others is but-for. So but-for the speech, the quote-unquote retaliation would not happen. Even if— So if that—I mean, I get this, too, is a hypothetical, but if the speech was protected, right, assume that all the speech, the three main categories, the three main instances that we've talked about, assume that was protected speech, then the fact that it was bullying or unprofessional, it would still be speech, right? And so it would still be causal. Now, when we get to balancing, that might go away. But wouldn't that—if we agreed it was all protected speech, hypothetically, as the district court did below, then wouldn't we sort of look at that from that perspective? Well, yeah, if we were to sort of set it as all of the speech is protected, which, as you know, we dispute— But the district court assumed that below. Didn't even analyze that question. Right. That's right. Then you can sort of prove causation a number of ways. One way is temporal. Right, but what I get is that, like, if it's protected speech and they say, well, but it was bullying speech, well, if it's protected but bullying, it still gets—it's still protected speech. It still causes the adverse action. And maybe at the pickering balancing, the fact that it was bullying, you win. Right? I understand that. But wouldn't it still be protected and it would still meet causation for purposes of those steps of the analysis we're making? Your Honor, I don't think that's exactly right. I think if the speech that's described as bullying, if the retaliation, again, alleged, is because of the bullying, that's separate and apart from the nature of the speech, which might be an issue of public concern. So you could have public speech on a public issue, but if— So long as they call it bullying, then they can say that's different. It's not speech anymore. Well, Your Honor, it's not that they call it— I'm not sure I understand that. Can you help me, like, can you point me to a case that suggests that as long as we say the speech isn't nice enough, that it is no longer protected? No, Your Honor, it's not that the speech—some of the speech could be protected, although we don't think any of it was an issue of public concern here. I understand. But it's not that some of the speech couldn't be protected. But here you have sort of two avenues. You have some speech, and let's just look at the blog post as an example. You have a blog post. It's four sentences long. He uses the word I and me five times in those four sentences. He argues that there is some embedded public issue discussed there. At the end of it, separate and apart from having nothing to do with the public issue, he takes a gratuitous shot at his colleagues, saying that he's insulting their intelligence. So even if you accept that there's some public speech in there— He's commenting on the substance of the program. Well, he does that, and then he insults the intelligence of his colleagues, separate and apart from that. And so there could be a circumstance like here where the part of the speech that's being responded to is the insult, is the demeaning commentary. And your view is on the blog post that that is not a citizen speaking about a matter of public concern, right? And my colleagues have sort of given up, you know, true academic interest, and now they're doing this, whatever it is, right? I'm not agreeing with it. I'm just trying to articulate his view that that is no longer protected speech. Well, Your Honor, I think under Goldstein it isn't. You know, the Goldstein test, I think, which has been applied many times since, would the public be truly concerned with the topic being discussed? And it's hard for me to imagine, and they really don't argue that the public would be truly concerned with what's going on at an academic conference, what the topics of the speakers are. The notion that this is something the public— Like, you think if we, I mean, hypothetically, if we went, you know, into Google News and we typed in Woke University, right, that nobody would be interested in that? Like, we probably know articles about it. It probably hadn't come up on social media, or nobody's talking about that? Well, what he's talking about, Your Honor, is an academic conference and what the speakers are talking about at the conference. Now, in his brief, he sort of—he talks about what was animating his concern, what was in his mind as he was saying these comments. But that's not what he actually said. The court has to look at the words he used. You look—you understand the blog post not to be talking about the, like, overtaking of university and academic—academia with woke subjects, as he describes them, instead of, you know, traditional academic interests? Your Honor, I mean, obviously the title— I mean, you've got good arguments here, but that doesn't seem like— Well, Your Honor, when your title says woke, you know, has woke in it, I certainly understand that there's some embedded content in there. What I'm saying is that at the end of the comment is a gratuitous insult, which really has nothing to do with the public issue or the issue of public concern. But nonetheless, and I certainly can see that the blog post is a closer question than the first two internal communications. But I think applying that Goldstein test, I do think it is important to say, is this something the public would be truly concerned with? And that is a judgment that the court can make as a matter of law. And I think it's important, with a few minutes left, to add the overlay here, which we haven't talked about yet, which is qualified immunity. Because Dr. Porter has to not only establish that he's pled a claim under Twombly— But you still would have the injunctive relief as an option. It would address damages only, qualified immunity would. For the individual defendants, yes. Yes, that's correct, Your Honor. Just to make clear, in Krauss and other cases, this court has said, these issues of law in the McVeigh analysis have to be resolved by clearly established law. So their burden is not just to meet Twombly and Iqbal, it's to meet Twombly and Iqbal with clearly established law at every step of the analysis. And so we think from adverse employment action all the way through McVeigh, there are four factors. It's the basis for determining whether a matter is a matter of clearly established law, from your view. Your Honor, you have to look at the cases. And, of course, as this court has said, the key challenge is how do you define the right? And in their brief, this is how they define it, page 39. And pretty much the Supreme Court over the years has been moving in a particular direction on that. Increasingly moving it has to be something specific from the Supreme Court or from this particular circuit. Not even a district court decision reaches forth in the many qualified immunity cases that are out there. And so in order to be able to establish that this is a matter that is, and you can reach this without even getting to the question of the constitutional violation, you go straight to it. And I'm just wondering what is it here that you say does not make this clearly established law? Well, Your Honor, really at every step there was at best a closed question, right? So the only case they cite that would satisfy this, either Supreme Court or circuit law, is Adams. But in Adams, the only question, the question in Adams was very narrow. That is their speech that is concededly on a public interest topic. The question there was, was that- How specific is the inquiry? In other words, what is it that is being argued that is clearly established? I mean, you could get pretty general. If you got general enough, you can get just about anything clearly established. That's right. But if the Supreme Court gets a little specific on these things, I would probably be more general on it and say, yes, clearly established, these things happen. But pretty damn specific. How do you- what is it here that is supposed to be clearly established? This is the way I would establish it, Your Honor. Where you have comments whose predominant focus was on disruptive personal attacks rather than issues of public concern and the de minimis action that the university took were primarily directed at insulating colleagues from the poor behavior, not the viewpoint, then qualified immunity should apply. So for those reasons, we would ask that the court affirm the judgment below. Thank you. Thank you, Your Honors. Ms. Harris, you have a few minutes. Thank you, Your Honors. You know, I'd like to address a few things that my colleague here said and draw your attention back to the fact that this is a 12B6 motion. And a lot of what NC State disagrees with is the facts that we've pled in the complaint. So, for example, you know, he says that the higher education program area pertains just to master's students. And so, you know, Dr. Porter being removed from it when he only worked with Ph.D. students is inconsequential. But we pled in multiple places in the complaint very specifically that although this distinction existed on paper, in practice all of the Ph.D. decisions and activities were still taking place in the higher education program area through at least 2018, 2019. So that's a dispute of fact, not a question of law. Similarly, you know, there are 26 paragraphs in the complaint about the impact of NC State's actions on Dr. Porter's career. Now, maybe discovery will, you know, bear out their arguments, but we haven't had discovery. And we've certainly pled enough in the complaint that we should get to have discovery to prove these allegations. I also want to address the fact that, you know, this issue of the isolated instance of profanity in the meeting, this took place after the retaliation had already begun, after Dr. Pasch had repeatedly talked about wanting to remove him from the program area for his protected speech. And I don't think that the case law bears out that an isolated instance of profanity in response to this retaliation and not directed, he didn't say F you to anyone, he just let an F bomb slip. I don't think that that is the type of, you know, sustained uncollegiality that justifies legally the actions of NC State. But the complaint also itself lays out a number of instances of his lack of collegiality leading up to that event in the meeting. Well, you know, what the complaint alleges is that NC State deemed his protected expressions of opinion uncollegial because they disagreed with them. And that that's a common occurrence. And, you know, there's case law. Called his colleagues stupid. Where in the complaint? In the blog, really. Well, I dispute that those are his colleagues. I mean, they weren't his colleagues at NC State. And I think that, you know, the defendants are trying to hide the ball a little bit by saying the blog post refers to his colleagues when he was referring to the field of higher education more broadly. Is the blog post standing alone sufficient to make out a claim if we took out everything else and it was just the blog post? Yes. Yes. Because that's what ultimately, despite, you know, these continued threats to remove him, that's what ultimately led to his removal. So the blog post is sufficient. You know, and I don't think in terms of the temporal connection that this court is bound by penalty. I mean, Penley was a very different case where, you know, this guy had expressed his opposition to a politician who had arguably made some negative comments about him to some of his supervisors. But then he undisputedly engaged in sexually inappropriate behavior in the classroom. And that was what he was investigated and ultimately terminated for. So there was this significant intervening event in Penley that wasn't present here. And, you know, I think that's a separate question. I mean, defendants are saying, well, his speech wasn't protected. So the fact that he was removed for his speech, you know, when it was, it's not that it wasn't the nature of the speech. It was that it was uncollegial bullying. Right. So they're not denying that the actions that were taken were taken because of his speech. Whereas in Penley, I think the school would say, well, no, it had nothing to do with this politician's dislike for him and everything to do with the sexually inappropriate behavior that he was investigated for. So I don't see, you know, Penley as controlling here because this is not a case where the plaintiff has pledged that temporal connection is the only factor. Because NC State has made clear that, in fact, he was removed for his speech. And, you know, as Judge Richardson raised, the question of whether, you know, NC State's subjective declaration that the speech was, you know, disrespectful or unprofessional, you know, doesn't render it unprotected. And, in fact, there's a case, Bhattacharya v. UVA Medical School, where there was a medical student who was asking some pointed questions of a presenter at a panel on microaggressions. And some other professors, you know, filed essentially a professionalism card against this student. And he was investigated for this. And the court held that the speech was protected, despite the fact that under UVA's policies, it was also subjectively deemed to be unprofessional. So we request that the court reverse the judgment of the district court. Thank you. Thank you, Ms. Harris. Thank you, Mr. David. You both withstood some very demanding questions and you performed quite well for the court. We're thankful that you're here. You heard me said you're now accepting a virtual handshake from us and maybe in the future we'll be able to shake your hands in person. Thank you.
judges: James Andrew Wynn, Stephanie D. Thacker, Julius N. Richardson